392 F.2d 954
 UNITED STATES of America, Appellee,
v.
John FRANZESE, also known as "Sonny," William David Crabbe, also known as "Red," John Matera, also known as "Johnny Irish," Nicholas Potere and Joseph M. Florio, also known as "Whitey," Appellants.
 No. 262.
 Docket 31391.
 United States Court of Appeals Second Circuit.
 Argued February 23, 1968.
 Decided March 25, 1968.
 
 Maurice Edelbaum, New York City (Lawrence K. Feitell, New York City, of counsel), for appellant John Franzese.
 Philip Vitello, New York City (Lawrence K. Feitell, New York City, of counsel), for appellant Joseph M. Florio.
 William L. Lynch, New York City, for appellant William David Crabbe.
 Raymond A. Brown, Jersey City, N. J., for appellant John Matera.
 Aaron J. Jaffe, Jaffe & Feldman, New York City, for appellant Nicholas Potere.
 Jerome C. Ditore, Asst. U. S. Atty. (Joseph M. Hoey, U. S. Atty. for Eastern District of New York), for appellee.
 Before FRIENDLY and SMITH, Circuit Judges, and GIGNOUX, District Judge.*
 FRIENDLY, Circuit Judge.
 
 
 1
 Five defendants, Franzese, Crabbe, Matera, Potere and Florio, appeal from convictions, after a verdict, in the District Court for the Eastern District of New York on two counts of an indictment, returned in April, 1966, charging robbery of two federal savings and loan associations on Long Island by placing lives in jeopardy in violation of 18 U.S.C. § 2113(d), a count for receiving currency and travelers' checks taken from a bank in Utah whose deposits were insured by the Federal Deposit Insurance Corporation in violation of 18 U.S.C. § 2113(c), and a count for conspiring to engage in bank robberies in violation of 18 U.S.C. § 371.[1] A chart in the margin shows the counts on which various defendants were convicted and the sentences imposed — some being very heavy ones.[2]
 
 
 2
 The prosecution had some unusual aspects, of which defendants have properly made much both at trial and on appeal. None of the appellants is claimed to have been present at any of the bank robberies here charged. The Government's case against them rested almost entirely on the testimony of four confessed participants — Smith, Parks, Cordero and Zaher — who cast the defendants in the role of behind-the-scenes operators of a nationwide bank robbery business.[3] Franzese was the general manager; Potere was the procurer and explicator of plans of the banks and took general charge of logistics; Florio assisted in these operations and in weapon procurement; and Matera and Crabbe played lesser parts. What is more troubling is that three of the Government witnesses — Smith, Parks and Zaher — had previously depicted Anthony Polisi, owner of the Aqueduct Motor Inn in Queens, as the master-mind of the same enterprise and had so testified in a trial in January, 1966, wherein Anthony and his son Salvatore were convicted, in contrast to the testimony of Smith, Parks and Cordero at the instant trial that Anthony's services after mid-July, 1965, were in storing weapons and furnishing a meeting place. This was substantially what Cordero, who had not been called as a witness against the Polisis, had said in statements to the FBI shortly after his arrest on September 30, 1965.[4]
 
 
 3
 While the testimony of the four participants was exceedingly detailed and circumstantial — indeed therein lay its strength — we shall state only so much as constitutes necessary background for the legal contentions raised on appeal: The quartet, dissatisfied with Anthony Polisi's management, were summoned to a meeting at the Aqueduct Motor Inn on an evening in late July, 1965, attended by all five appellants. Franzese announced that he was taking over, on a 50-50 basis, and that work orders would be issued by his four associates from time to time. Matera added that the arrangements included money for bail and for lawyers in the event of arrest, but that "ratting on anybody is completely out of the question because we will get you." Franzese confirmed the former comforting assurance and made known that his services included the stealing of cars to be used in the robberies and that, after a reasonable period of success, the robbers could cease their robbing and he would act as an investment counselor for them.
 
 
 4
 Another meeting occurred toward the very end of July. At the first phase, attended by Potere, Florio and Cordero, Franzese announced the acquisition of plans of five banks, including the Queens and Oceanside banks the later robberies of which were charged in substantive counts of the indictment. These plans had been supplemented with an indication of the get-away route and the location for the cars to which the robbers would switch after abandoning the getaway cars. There were renewed assurances about bail and lawyers and confirmation of the financial split. Later the participants other than Franzese adjourned to the Aqueduct Motor Inn, met with Parks, Smith and Anthony Polisi, and arranged for all but Polisi to reconnoiter the five banks the next day. After a dress rehearsal conducted by Florio in which the get-away driver, Anne Messineo, was introduced, Cordero, Parks and Smith robbed the Queens County Federal Savings and Loan Association on July 30, 1965, with disappointing results due to their failure to enter the vault. After a similar prelude the trio robbed the United States Savings and Loan Association in Oceanside, Long Island, on August 13, 1965, again with less than spectacular success.
 
 
 5
 We pass over activities planned for banks in Massachusetts, leading to the robbery of the Holyoke National Bank in Chicopee, accomplished on August 31, by Smith, Parks and Cordero, again without entering the vault, wherein Smith's girl friend Carol Scalzo and Salvatore Polisi played supporting roles. Early in September, Franzese directed that activities be transferred to Denver and Salt Lake City, Cordero was to take his wife and Smith was to take Carol. Crabbe, who now reappeared, asked leave to go along, but Franzese declined because of needing him closer to home. After the kind of contretemps happily characteristic of such ventures, the two couples and Parks arrived in Denver behind schedule, the men robbed the bank on a Saturday rather than the appointed Friday for the truly meagre haul of $300, and all proceeded to Salt Lake City. Monday brought better luck there — $33,000 in cash and some travelers' checks. Desire of the robbers to alter the agreed split led to a meeting between them and Franzese, Florio, Matera and Crabbe at the Skyway Motel in Queens. Florio told Franzese the trio had offered only $6000 plus the travelers' checks as his share. Crabbe counted the cash; Matera examined the checks, assured Franzese there would be no trouble in getting rid of them, and put them in his pocket. Somewhat surprisingly, Franzese did not cavil overmuch at the unilateral change in terms, although taking a sterner tone for the future. There was talk of California and some preliminary observations were later made on Long Island and in Brooklyn, but time was running out for the four robbers. Parks and Smith were arrested on September 30, Cordero on October 1, and Zaher, whom Matera had warned not to be around, on October 8. The promised immediate succor was not forthcoming, save as indicated in footnote 3 and for payments of $200 by Anthony Polisi to Zaher and of $50 by Potere to Smith.
 
 
 Sufficiency of the Evidence
 
 
 6
 Matera and Crabbe are the only appellants to challenge the sufficiency of the evidence, and they do this solely with respect to Count 7 for receiving property stolen from the Utah bank. The evidence of their activities at the division of the loot meeting was sufficient for submission to the jury, particularly when this is taken in the light of evidence that we have recounted and of more that we have not. In any event the point is immaterial in view of the concurrent sentence on the conspiracy count. Lawn v. United States, 355 U.S. 339, 359, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). We likewise reject Matera's argument that the court committed reversible error in refusing to charge he was entitled to an acquittal if the jury believed testimony adduced by him to show that he was sojourning with his wife and a Mr. and Mrs. Scotto at a resort in the Poconos from July 17 to July 24 — a period including the date of the organization meeting which, along with the meeting on the robbers' return from Salt Lake City, constituted his sole proven participation in the crimes. The judge had properly instructed as to reasonable doubt and the jury manifested its realization of the importance of the alibi evidence by asking for a rereading of the direct testimony of Mrs. Matera, Mrs. Scotto and a Mrs. Principe, a friend who had also been at the resort. Having heard these witnesses, the jury evidently chose not to credit them.[5] That was its prerogative.
 
 
 The Government's Rehabilitation of Its Witnesses
 
 
 7
 The point most strongly pressed concerns the extent to which the Government was allowed to rehabilitate its witnesses after impeachment based on their failure to mention the defendants in statements given the FBI on their arrest and their testimony before the grand jury which indicted the Polisis and at the Polisi trial. The problem first arose in the case of Smith, the Government's lead witness. In his grand jury testimony against the instant defendants, which had been furnished defense counsel before he took the stand, Smith had been asked to account for the discrepancy between it and his failure to include the defendants in the information previously given the Government and his testimony in the Polisi proceedings. He answered:
 
 
 8
 "Because, as far as I was concerned, I was ready to go and take my just punishment. They would look out for my family and put up the bail money, and try and get me back out. And they just didn't do it, you know, they forgot all about it. And I felt I didn't owe them nothing no more."
 
 
 9
 Appellants hammered away at Smith on the basis of his long failure to include them in his list of culprits and his fixing of managerial responsibility in the elder Polisi, see fn. 4.
 
 
 10
 The Government then made known to the court that it proposed to rehabilitate Smith by showing that his previous silence as to the defendants was due to fear. After requesting counsel to prepare memoranda over a weekend, Judge Mishler said that his own search had led him tentatively to conclude that a witness may explain an inconsistency on the basis of fear even if his doing so imparts evidence of another crime, but that the trial judge has an obligation to allow "only so much * * * as will explain his fears" and to "exclude any other matter that * * * will lead the jury away from these issues and in effect decide the character or other crimes of these defendants." After much discussion it was decided to conduct a hearing outside the presence of the jury, at which Smith would explain the basis of his fears.
 
 
 11
 Smith's explanations proved exceedingly colorful — so much so that the judge felt it necessary to impose limitations on what the prosecution could elicit before the jury. He also carefully instructed the jury as to the bearing of the evidence it was about to hear. He explained that some of this would relate to issues not in the case and also would be hearsay if offered as proof of the facts stated, and that "the real issue is did this witness believe what he heard and what he understood generally and was it for that reason that he failed to name these defendants at the previous times and on the previous occasions."
 
 
 12
 Smith then testified that when he gave statements to the FBI on October 14, 1965 and evidence at the Polisi trial in January 1966, he feared for his life if he were to implicate the defendants. He cited the statement by Matera at the organization meeting as to what would happen if anyone informed. He said also that Carol Scalzo, his girl friend, warned him, while in jail, that Potere was aware that he had not informed on the instant defendants and had said Smith must know would happen to himself if he did.[6] He continued that on October 14, 1965, he was told by Parks, Zaher and Cordero that they had made no statements against these defendants, and that the four discussed the threat of bodily harm or death if Smith informed. Smith further stated that he feared death in prison if he informed; that when he joined the conspiracy he was promised money for lawyers, bail and his family, benefits he would lose if he informed; that he believed his family would be harmed if he implicated the defendants; that in September, 1965, he asked Zaher if the latter would inform on the defendants if arrested and Zaher had said, "No, I know better than that, I have a family out there"; and that while in jail in January, 1966, Zaher told Smith that a prison guard, Gucci,[7] brought him a message warning Zaher that if he informed on the defendants, he would wind up dead. After having followed the same procedure as with Smith, the judge allowed Cordero to testify that his failure to mention the defendants in statements given the FBI and testimony before the grand jury in October, 1965 was due to fear for his safety both in and out of prison and for his family, based on conversations with Franzese, Crabbe, Florio and Parks, and also to apprehension that he would lose money for bail, lawyers and his family if he informed. Parks was similarly permitted to explain that his failure to mention the defendants in his FBI statements of October, 1965 and his testimony before the Polisi grand jury and at the Polisi trial was due to fear of bodily harm, based on conversations with Matera and Crabbe and with inmates of the Federal House of Detention.[8]
 
 
 13
 Appellants do not seriously challenge the basic principle that a witness impeached on the basis of prior inconsistency "may always endeavor to explain away the effect of the supposed inconsistency by relating whatever circumstances would naturally remove it," 3 Wigmore, Evidence, § 1044, p. 737 (3d ed. 1940) — a rule we recently applied in United States v. Scandifia, 390 F.2d 244, 250 (2 Cir. 1968). Fear of the consequences of plain speaking is such a circumstance, as many cases have held, see, in addition to Scandifia, People v. Chapleau, 121 N.Y. 266, 277, 24 N.E. 469 (1890); People v. Buchalter, 289 N.Y. 181, 202, 45 N.E.2d 225 (1942); Hendrickson v. Commonwealth, 64 S.W. 954, 956, 23 Ky.Law Rep. 1191, 1194-1195 (1901); and Bradford v. State, 38 Ala. App. 587, 90 So.2d 96, 97-98 (1956). It is likewise clear that the witness may explain his fear as induced by a threat communicated by an intermediary, United States v. Scandifia, supra, 390 F.2d at 251, n. 8; State v. Minton, 234 N.C. 716, 68 S.E.2d 844, 850, 31 A.L.R.2d 682 (1952), although the opposing party is entitled to an instruction, here given by the judge of his own motion, that the intermediary's statement is not evidence that the threat in fact was made by the alleged source. While rehabilitation of this sort may well have a spill-over effect, the process is essential to development of the truth and reliance must be placed on trial judges to prevent unfair tactics by the prosecution.
 
 
 14
 Appellants rely on two main contentions to escape these settled rules. One is that their counsel were led into cross-examining on the basis of prior inconsistency, with consequent alleged devastating effect of the rehabilitation on the defendants, by Smith's incomplete explanation before the grand jury which we have quoted. The other is that it was error to allow the witnesses to testify generally to a state of fear as distinguished from specific incidents emanating from the defendants. We find no force in either argument.
 
 
 15
 Faced with the extremely circumstantial accounts given by the four witnesses, with no material inconsistencies among them and no contradiction save for Matera's alibi evidence as to his absence in the Poconos at the time of the organization meeting, appellants' counsel could not have afforded to rely merely on the witnesses' bad records and the usual attacks on the testimony of accomplices with much to gain by concocting a story the prosecution would like to hear. Development of the witnesses' prior inconsistency was the only real hope for arousing reasonable doubt — as evidenced by counsel's continued use of this tactic on Cordero and Parks, who had made no statement like Smith's before the grand jury, after experience with Smith revealed the riposte this would almost certainly attract. We thus cannot take seriously appellants' argument that it was Smith's statement that led their counsel into a trap.
 
 
 16
 In any event none of this would have legal consequence unless the Government was in some way culpable. Appellants say it was. They cite a statement by the prosecutor in colloquy that he "had a conversation with each of these witnesses before they went into that grand jury and said `Don't mention this organized crime in there; don't mention this killing business; don't mention the fear element' and the same when these people have been put on the stand." Needless to say, we strongly disapprove a prosecutor's ever advising a witness to tell less than the whole truth. But it would be wrong to take the quoted statement, made in the heat of courtroom argument, as an admission that the prosecutor had done this. We read his warning to the witnesses rather as a caution, commendable in itself, against volunteering information concerning the defendants' criminal background not responsive to specific inquiries. If the prosecutor is to be faulted at all, it would be rather for allowing Smith's answer to the grand jury to stand without amplification, assuming as we do that he then knew how incomplete it was. But it would be calling for more prescience than prosecutors can reasonably be expected to possess to think that this omission, favorable to the accused at the time, was intended to lure them to their destruction at the trial.
 
 
 17
 Several of the authorities previously cited sustain the proposition that an impeached witness may explain a previous inconsistency on the basis of fear generally, People v. Chapleau, supra; Bradford v. State, supra, leaving it to the impeacher to inquire into the basis if so advised. Moreover the witnesses here did cite chapter and verse for their fear and the examinations conducted outside the presence of the jury demonstrated they could have given a good deal more. To the extent that the judge prevented proof of specific incidents, the defendants were the gainers;[9] his conduct of this novel trial problem deserves commendation rather than the censure the defendants urge.
 
 
 Mrs. Cordero
 
 
 18
 Appellants make a number of arguments relating to Mrs. Cordero. An FBI report given to defense counsel had recorded Cordero as stating that his wife had driven one of the three switch cars following the Oceanside bank robbery of August 13. On cross-examination Cordero denied having said this, although he stated that his wife had innocently participated in the robbery and elaborated on redirect that she had been waiting in the "switch car point" area. After the Government rested, appellants stated they intended to call FBI Agent Murphy to ascertain the name of an informer whose statement that Mrs. Cordero drove the car used in the Oceanside robbery had afforded the basis for an affidavit by Murphy leading to her arrest. On a voir dire examination Murphy said that the informer had no part in the robberies and that the information as to Mrs. Cordero's ownership of a car that took part in the robbery was in error. When the Government objected to Murphy's being compelled to divulge the name of the informer, defense counsel argued this was necessary to enable them to attack the credibility of Cordero's statement that his wife had not participated in the robbery and to demonstrate a further reason for Cordero's seeking the Government's favor.[10] Considering these issues to be "purely collateral," the judge thought the benefit of revelation to the defense was outweighed by detriment to the Government in its investigation of crime and by danger to the informer.
 
 
 19
 On what was put to him the judge's decision was well within the discretion necessarily allowed under the controlling ruling in Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). Evidence that a witness had lied in refusing to implicate an unrelated person not indicted would be inadmissible even under the test of "collateralness" approved by Wigmore, perhaps more liberal than that generally applied: "Could the fact, as to which error is predicated, have been shown in evidence for any purpose independently of the contradiction?" 3 Evidence, § 1003 at p. 657; see Smallfield v. Home Ins. Co. of New York, 244 F.2d 337, 341 (9 Cir. 1957); the case would have stood differently in this regard if Anne Messineo had been on trial and her counsel had sought the informer's testimony to prove that Mrs. Cordero rather than Anne drove the get-away car. The sole basis for admissibility of evidence of Mrs. Cordero's participation would thus have been in furnishing a further indication of Cordero's bias and corruption. While evidence would have been receivable for that purpose, see id. § 1005(2), the jury had already heard so much on that subject, including Cordero's own rather equivocal testimony as to his wife's involvement, which the judge expressly called to their attention in his charge, that the incremental value of evidence by the informer was outweighed by the opposing considerations, especially the great dangers to him indicated by what the "fear" testimony of Smith, Cordero and Parks had revealed.
 
 
 20
 In brief and argument before us, appellants have developed a somewhat different theory as to the use to which they might have put the informer. Stressing the Government witnesses' opportunities to develop a consistent story while living together in jail, they argue that, as said in Franzese's brief, "it was of the utmost importance to the defense to show that the exclusion of Mrs. Cordero by the connivance of the gunmen was related, part and parcel, to the objective of keeping Mrs. Cordero out of the case lest she become an uncontrollable link in the government's chain of proof." The suggestion, apparently, is that if the informer had implicated Mrs. Cordero, the defendants might have called her or the Government might have considered itself forced to call her, with consequences no one now can tell. Apart from the fact that nothing prevented the defense from calling Mrs. Cordero, it suffices that this theory was never presented to the trial judge.[11]
 
 
 21
 We have been more concerned over another episode. When Cordero was arrested in his house on October 1, 1965, the special agents found a plaid suitcase containing some $10,000 in currency. He then told the agents this money belonged to his wife but at arraignment altered his story and said it was obtained by him from bank robberies. At the trial, although admitting that at one time he told the agents that all of the money was the proceeds of his bank robberies, he stated that only $2000 constituted such proceeds.
 
 
 22
 The cause of our concern is that prior to trial all this money, except for $200 in $20 bills identified as having come from the Salt Lake City robbery, was returned to Mrs. Cordero. This was done pursuant to order of Judge Mishler, on a motion by Mrs. Cordero supported by her affidavit that "the monies are not the fruits of a robbery and belong to deponent who requires this cash immediately for support of her family," and an affidavit by the prosecutor that, except for the identified bills, "the government has no evidence to show the remaining monies are not those of the aforesaid Eleanor Cordero, and has no other claims for this money from any other party." Conceding as they must that the return of the money was fully before the jury,[12] appellants argue on appeal that this was "dirty business" requiring at minimum a new trial in which any testimony by Cordero would be excluded. We must confess that the Government's attitude strikes us as rather complaisant; the combination of the presence of bills identified as stolen from the Salt Lake City bank and Cordero's admissions would at least have justified a demand on its part for a hearing at which Mrs. Cordero would have to prove her case by live testimony. But we see no basis for invoking our supervisory powers when the Government submitted the issue to the trial judge, even though we might have been less inclined to order immediate return of the money.
 
 
 Evidence Concerning Events Subsequent to September 30, 1965
 
 
 23
 Count 8 of the indictment charged that "On or about and between the 15th day of July, 1965 and the 30th day of September, 1965, both dates being approximate and inclusive," the defendants conspired to rob various banks, "including but not limited to" a list therein set forth. The indictment named not only the banks proved to have been robbed and others whose robbery had been first considered and then abandoned before September, 30, but still others, notably the Great Neck branch of the Franklin National Bank, the Atlantic Ave. branch of the Manufacturers Hanover Trust Company and unknown banks in California that were still on the active list when Parks and Smith were arrested on September 30. Over defense objection the Government was allowed to offer certain evidence as to events somewhat subsequent to that date, notably a $50 payment from Potere to Smith, a meeting wherein Polisi gave Zaher some money and told him to get rid of his guns and stay away, and, most damaging, telephone calls and correspondence between the lawyers for Parks and Cordero and Potere to obtain money and checks from the latter, see fn. 3.[13]
 
 
 24
 It is plain enough that but for the September 30 date in the indictment all this evidence would have been competent. The testimony supported the view that the bank robbery conspiracy was a continuing one, with the four arrests merely a rift in the lute so long as the prisoners did not identify their associates who remained at large. The furnishing of bail and lawyers had been an agreed part of the conspiracy from the beginning, designed in part to permit its continuation if mishap should befall any member. Defendants are thus mistaken in relying on such well-known decisions as Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); and Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), wherein the Court rejected Government efforts to prolong the period during which declarations are deemed in furtherance of a conspiracy and thus admissible against all members or to extend the date for starting the statute of limitations, on the basis of an implied subsidiary conspiracy to conceal a crime fully accomplished. As said in Grunewald, supra, 353 U.S. at 405, 77 S.Ct. at 974, "[A] vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." Cf. Ingram v. United States, 360 U.S. 672, 679 n. 10, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). Here the jury could find that the bank robbery conspiracy remained an on-going enterprise after September 30 notwithstanding that several members were in custody. While the Government conceded that their participation had terminated and any declarations by them would thus be inadmissible against others, none were offered, and the judge charged that acts or declarations of other members could be considered only if the jury found the conspiracy continued.[14]
 
 
 25
 The case is thus the common one of a variance, and a quite inconsequential variance at that. The September 30 date in the indictment was stated to be "approximate," and the overt acts included two September 29 conversations between Potere and Parks as to contemplated inspections and subsequent robberies, which Parks' arrest did not foreclose. Defendants do not seriously contend that proffer of the post-September 30 evidence subjected them to unfair surprise, and there is no appreciable risk of their convictions failing to bar subsequent prosecution for the minor acts after that date. The tests laid down in Russell v. United States, 369 U.S. 749, 763-764, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), are thus amply satisfied.
 
 
 Instructions to the Jury
 
 
 26
 The only point as to instructions that requires discussion concerns the familiar subject of reasonable doubt. The charge on this point was unexceptionable and without exception, the judge having defined a reasonable doubt to be a "fair doubt * * * based on reason and common sense and reasoning from the state of the evidence" and proof "beyond a reasonable doubt" to be "such as you would be willing to rely and act upon in the most important of your affairs." The difficulty arose when the jury, during its deliberations, requested an explanation of "beyond a reasonable doubt to a moral certainty." The jury had gotten hold of that confusing phrase because the judge had allowed Franzese's counsel to say, in summation, that the Government must prove guilt "beyond a reasonable doubt to a moral certainty."
 
 The court answered the request by saying:
 
 27
 "It is rarely possible to prove anything beyond all doubt. The Law requires that the Government prove its case beyond all reasonable doubt. When we talk about proof beyond a reasonable doubt that convinces you to a moral certainty of the defendant's guilt, when we use the term moral certainty, we do not mean that you reach your decision other than by means of reason. It again means that the Government must prove its case beyond a reasonable doubt, and as I intended to convey, an understanding of when we say to a moral certainty. Now the term `proof beyond a reasonable doubt' in my humble opinion defies further definition than that I have already given you. I hope what I have given you satisfies you.
 
 
 28
 You may retire for further deliberation on the matter before you."
 
 
 29
 Appellants objected to this instruction and requested the court to reread its main charge on reasonable doubt. The judge declined on the ground that the jury had not requested it, but offered to recall them and instruct that what he had just said must be placed in context with the entire charge. Appellants declined this offer.
 
 
 30
 While it would have been better if the judge had complied with appellants' request, it would be quibbling to reverse on that score. In effect the judge told the jury that proof "to a moral certainty" and proof "beyond reasonable doubt" were equivalents, cf. United States v. Johnson, 343 F.2d 5 (2 Cir. 1965), and reaffirmed his original charge as to the latter. If appellants had accepted his offer, the jury would very likely have asked to have the original charge reread and any possible confusion would have been dispelled. Even without that, we find nothing to make us fear that the jury was unaware of the heavy burden of persuasion placed upon the Government.
 
 
 Request for an Order to the Department of Justice to Make an Investigation With Respect to Wiretap Evidence
 
 
 31
 Prior to trial appellants applied for production of the tapes or records of a wiretap in the Aqueduct motel conducted by the New York City Police Department. The Government reported to the court that the Police Department had no tapes or records; that the Government had had no knowledge of their existence until this was revealed by the defense at the Polisi trial; and that neither it nor its agents had received any information, leads or evidence from these tapes or any other electronic device. Appellants then dropped the inquiry.
 
 
 32
 Although nothing in the trial suggested this to have been a misrepresentation, appellants now ask us to direct the Department of Justice to conduct a comprehensive review of its records to determine whether the Government took part in or is aware of any other incidents of wiretapping or electronic eavesdropping. We see no reason for embarking on what, so far as we can see, would be a policy of requiring such an investigation in every criminal case, even when there is not the slightest reason to suspect offensive conduct by the Government. The recent decision in Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968), further argument granted March 18, 1968, called to our attention at oral argument, lays down no such mandate. The Supreme Court there held that when the Government admitted monitoring a defendant's conversation, it could not unilaterally determine that nothing relevant had been heard.
 
 
 33
 We have fully considered other points raised by appellants but believe they do not warrant discussion. We reject the suggestion of misconduct on the part of the trial judge. Judge Mishler presided over this long and hotly contested trial with exemplary fairness and also with the skill in the conduct of difficult multi-defendant prosecutions we have come to expect from him.
 
 
 34
 The judgments of conviction are affirmed.
 
 
 
 Notes:
 
 
 *
 Of the District Court of Maine, sitting by designation
 
 
 [1]
 Judge Mishler granted a change of venue from Brooklyn because of pre-trial publicity; on the consent of all the defendants the trial was held in Albany
 
 
 [2]
 
 Count Bank Defendants Sentence
 2 Robbery of a savings & Federal Savings & Loan, Franzese 25 years & $10,000
 loan ass'n by placing lives Queens Co. Potere 15 years
 in jeopardy. 18 U.S.C. §§ Florio 15 years
 2113(d) and 2.
 4 Robbery of a savings & United Savings & Loan Franzese 25 years & $10,000
 loan ass'n by placing lives Ass'n, Oceanside, L. I. (consecutive with #2)
 in jeopardy. 18 U.S.C. &&
 2113(d) and 2. Potere 15 years (concurrent
 with #2)
 Florio 15 years (concurrent
 with #2)
 7 Receiving stolen currency First Security Bank of Franzese 10 years (concurrent
 and travelers checks from Utah, Salt Lake City, with #2 and #4)
 a federally insured bank. Utah Crabbe 5 years (concurrent
 18 U.S.C. §§ 2113(c) and with #8)
 2. Matera 5 years (concurrent
 with #8)
 Potere 10 years (concurrent
 with #2, #4 and #8)
 Florio 10 years (concurrent
 with #2, #4 and #8)
 8 Conspiracy to rob federally Queens Co. Sav. & Loan Franzese 5 years (consecutive
 insured banks. 18 with #7, concurrent
 U.S.C. §§ 371 and 2. with #2 and #4)
 Oceanside Sav. & Loan Crabbe 5 years (concurrent
 with #7)
 Holyoke Nat'l Bank Matera 5 years (concurrent
 with #7)
 First Security Bank of Potere 5 years (concurrent
 Utah with #2, #4 and #7)
 Banco de Ponce (Brooklyn) Florio 5 years (concurrent
 with #2, #4 and #7)
 East Tredmont Sav. &
 Loan
 United Industrial Bank
 (Brooklyn)
 Lafayette Nat'l Bank (Suffern)
 Manufacturers Hanover
 Trust Co. (Brooklyn)
 Suffolk Franklin Savings
 Bank
 Franklin National Bank
 (Great Neck)
 Certain Banks in California
 
 
 [3]
 The only other evidence of importance adduced by the Government was testimony by the lawyers who had represented Parks and Cordero after their arrests to the receipt from Potere of $1100 for Parks and $960 for Cordero — this to be used for attorneys' fees and bail and for a payment of $500 to Mrs. Cordero
 
 
 [4]
 In fact the inconsistency was not quite so great as appellants argue. The indictment in thePolisi case had three counts. Count One charged the robbery of the Central Queens Savings & Loan Ass'n on July 7, 1965, Count Two charged the robbery of the same institution by putting persons in danger, and Count Three charged a general conspiracy to rob both the Central Queens institution and the Queens County Federal Savings & Loan Ass'n on July 30, 1965, one of the robberies charged in the instant indictment. The evidence at the Polisi trial also included a robbery of the Jamaica Savings & Loan Ass'n on July 13, 1965. The testimony at the Polisi trial as to the robberies of July 7 and 13, both antedating a meeting hereafter described where Franzese is alleged to have taken over, is consistent with the story told by the Government's witnesses in this case; the conflict comes with the robbery of the Queens County Federal Savings & Loan Ass'n on July 30. This court affirmed the Polisis' convictions from the bench in November, 1966; the Government did not disclose its new information as to Anthony's less significant role in the Queens County Savings & Loan robbery.
 
 
 [5]
 Matera's claim that the trial judge unfairly discredited a fourth witness, the owner of the hotel, who had testified to Matera's room reservations, by asking whether there were records that would show Matera's presence in the dining room, is without basis. The room records alone would not negate Matera's attendance at the evening meeting in Queens and it was important for everyone, including Matera, to know whether anything more was available
 
 
 [6]
 We find no merit in appellants' complaint of the Government's failure to call Scalzo. She was not in custody and was equally available to appellants
 
 
 [7]
 Gucci was produced by the Government for appellants, who interviewed him but chose not to call him, avowedly because his credibility would not withstand a federal conviction for violating his duties as a prison guard
 
 
 [8]
 Zaher was not permitted to testify with similar elaboration since there was no inconsistency between his evidence at the instant trial and his prior statements — Zaher having been absent from July 21 until shortly before the arrests
 
 
 [9]
 For example, Cordero was not permitted to testify that Franzese had admitted that he had ordered Ernie "The Hawk" Rupolo, who at one time testified against Vito Genovese, to be killed in gang-land fashion — shot, stabbed, tied up, put in cement, and thrown into Jamaica Bay — and that Crabbe had said he was personally going to kill a fence who had testified against him just as he had killed the "Hawk." He also was not permitted to testify that Crabbe had threatened to kill Mrs. Cordero because Crabbe thought she was giving information to the "cops" and that Franzese had ordered Cordero to get her out of town
 
 
 [10]
 Defense counsel also urged that testimony by the informer might cast a sinister light on the Government's return of money to Mrs. Cordero — a subject discussed below. However, apart from other considerations, the information related to the Oceanside robbery whereas the suspicion as to the money was primarily as to the later Salt Lake City robbery
 
 
 [11]
 The trial court examined the FBI intra-office memoranda as to the informer and found they were not producible at the instance of the defendants. We have likewise done this and agree. We add that the information as to Mrs. Cordero is exceedingly vague
 
 
 [12]
 Defense counsel also made considerable point in summation that after the Polisi trial Smith got back a car, which he sold for some $800, and that at some time Parks got back a Cadillac, purchased for $5000 after the Salt Lake City robbery, which he sold for some $3500. There was no evidence that either car had been used in the robberies or that Smith's car had been purchased with their proceeds. Parks claimed he had bought the Cadillac with money won at the race track and from card games; naturally the defense questioned this but the evidence was inconclusive. Although defendants now complain of the charge in respect of these matters, no exception was taken at the trial, and there surely was not "plain error."
 
 
 [13]
 Most of these incidents were in October. The sole exception was an exchange of communications between Parks' lawyer and Potere in November and December; the court allowed this only as against Potere but appellants contend the limitation had no practical effect
 
 
 [14]
 Insofar as this charge lumped acts with declarations, it was too favorable to the defense. See Lutwak v. United States, supra, 344 U.S. at 617-619, 73 S.Ct. 481; United States v. Costello, 352 F.2d 848, 853-854 (2 Cir. 1965), vacated on other grounds, 390 U.S. 201, 88 S.Ct. 898, 19 L.Ed.2d 1033 (1968). Here the post-September 30 evidence seems to have consisted almost solely of acts