**UNITED STATES of America,**
**Appellee,**

v.

**Samuel GOLDBERG, Alexander Scheftel,**
**Max Tanenbaum, Sol Teret, Appellants.**

**No. 500, Docket 31432.**

United States Court of Appeals
Second Circuit.

Argued June 4, 1968.

Decided Sept. 19, 1968.

Certiorari Denied Feb. 24, 1969.

See 89 S.Ct. 895.

H. Elliot Wales, New York City, for appellant Goldberg.

Daniel H. Greenberg, New York City, for appellant Scheftel.

Julian G. Linker, Brooklyn, N. Y. (Linker & Linker, Brooklyn, N. Y., on the brief), for appellant Tanenbaum.

Gilbert S. Rosenthal, New York City, for appellant Teret.

James D. Zirin, Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York, N. Y., Pierre N. Leval, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before WATERMAN and FEINBERG, Circuit Judges and ZAMPANO, District Judge.*

ZAMPANO, District Judge:

On October 6, 1964, a grand jury returned a 32 count indictment charging 31 defendants with conspiracy to violate the anti-fraud provisions of the Securities Act of 1933, 15 U.S.C. § 77q(a), and the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343; and with various substantive violations of those statutes. Seven of the defendants were put to trial in the instant case, including the appellants Goldberg, Scheftel, Tanenbaum and Teret. After a lengthy trial, the jury found all the appellants guilty of conspiracy; in addition, Goldberg, Tanenbaum and Teret were convicted on one or more of the remaining counts in which they were named. Various grounds are advanced on appeal for reversals of these convictions.

I

The appellants' first contention that the evidence was insufficient to support the verdicts is without merit. With respect to these four appellants, the evidence clearly established the existence of a defrauding scheme involving Goldberg, manager of the Biltmore Securities Corp. (Biltmore), and Scheftel, Tanenbaum and Teret, three of Biltmore's salesmen. In 1958 and 1959, Biltmore, an over-the-counter stock brokerage firm, "papered" prospective customers in several states with glowing printed reports and brochures, touting the virtually worthless stock of Lutah Uranium and Oil Company and its successor by merger, Shelton-Warren Oil Company. The names and addresses of these potential customers were recorded on "lead cards," over which Goldberg retained custody and control. Each day, as part of Biltmore's regular operations, Goldberg would distribute 10 to 15 of these cards to the Biltmore salesmen. They in turn would telephone the prospects listed on their "lead cards" and attempt to make an initial sale of Lutah or Shelton-Warren stock. If successful, the salesman would record and process

* Of the District of Connecticut, sitting by designation.

the sale, and return the customer's card to Goldberg, who would recontact the customer and attempt to "load" him with additional stock. Each salesman received a commission on "opener" transactions ranging between 10 and 12½% of the gross sales price; he received half of the regular commission on any subsequent "loads" made by Goldberg.

■ The government introduced ample evidence of the various manipulative selling techniques which the appellants employed in this "boiler room" operation. The indicia of fraud in these transactions included deceptive literature and flagrant, oral misrepresentations. Twenty-six customer-witnesses testified to their reliance on the appellants' false statements and misleading omissions. This evidence entitled the jury to find that the appellants employed fraudulent techniques "to sell a large volume of shares of one issuer by long-distance telephone * * * without disclosure to prospective purchasers of adverse financial information and [without] any reasonable basis for the optimistic statements and predictions made." Berko v. Securities and Exchange Comm., 297 F. 2d 116, 117 (2 Cir. 1961). There was substantial evidence that each one of the appellants knowingly and actively participated in this fraudulent scheme to bilk the public by selling worthless stock. United States v. Bilotti, 380 F. 2d 649 (2 Cir.), cert. denied, 389 U.S. 944, 88 S.Ct. 308, 19 L.Ed.2d 300 (1967); United States v. Kelly, 349 F.2d 720 (2 Cir. 1965), cert. denied, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); United States v. Ross, 321 F.2d 61 (2 Cir.), cert. denied, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963).

## II

Goldberg and Teret challenge their mail fraud convictions on the ground that the mailing of a stock certificate to a customer could not be "for the purpose of executing the scheme"—an essential element of the crime charged—but only "incidental and collateral thereto." They contend that, because they mailed stock certificates only at the customer's request and only after the purchase in question had been completed and paid for, such mailings were not "incident to an essential part" of the fraudulent transaction. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954).

■ However, a failure upon request to deliver the stock sold would surely arouse a customer's suspicion and invite unwanted inquiry and perhaps rescission of the sale. Hence, the jury could reasonably infer that the delivery of the stock certificates was part of appellants' planned and deliberate use of the mails during the course of the scheme to lull their victims into a sense of security and to permit Biltmore to continue its relations with these customers. Bliss v. United States, 354 F.2d 456, 457 (8 Cir.), cert. denied, 384 U.S. 963, 86 S. Ct. 1592, 16 L.Ed.2d 675 (1966). In any event, the point is immaterial in view of the concurrent sentences imposed on the substantive counts. Lawn v. United States, 355 U.S. 339, 359, 362, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); United States v. Franzese, 392 F.2d 954, 958 (2 Cir. 1968).

## III

Tanenbaum argues the trial court committed reversible error in two respects: (1) by admitting into evidence certain charts and summaries; and (2) by refusing to grant him a mistrial after it became apparent that his attorney was laboring under a conflict of interest.

■■ The charts and summaries admitted into evidence were constructed exclusively from the testimony of the government's witnesses and from Biltmore's voluminous business records, which had been previously admitted into evidence. The court carefully charged the jury that these resumés were not themselves independent evidence, but only "visual representations of information or data as set forth in the testimony of a witness or in documents that are exhibits in evidence." The trial judge further pointed out that the charts

and summaries were "no better than the books or the testimony upon which they are based, and it is for you to decide whether the charts, schedules or summaries correctly present the data set forth in the testimony and exhibits upon which they are based." We have examined the charts and summaries objected to and find no basis for the claim of prejudice; their admission was well within the trial judge's discretion. United States v. Ellenbogen, 365 F.2d 982, 988 (2 Cir. 1966), cert. denied, 386 U.S. 923, 87 S.Ct. 892, 17 L.Ed.2d 795 (1967); Swallow v. United States, 307 F.2d 81, 84 (10 Cir. 1962), cert. denied, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499 (1963); United States v. Kelley, 105 F.2d 912, 918 (2 Cir. 1939). Nor was there error in submitting to the jury a chart prepared by the trial judge which specified the counts in which each defendant was named and summarized the witnesses and number of shares of stock to which each count related. United States v. Swan, 396 F.2d 883 (2 Cir. 1968); United States v. Bozza, 365 F.2d 206, 225 (2 Cir. 1966).

Tanenbaum's second point concerns the trial court's decision to appoint Tanenbaum's attorney as counsel for another salesman-defendant, Albert Lerch. We have recently expressed disapproval of this practice, Morgan v. United States, 396 F.2d 110 (2 Cir. 1968); but we find it resulted in no prejudice to Tanenbaum in the instant case.

■ Tanenbaum urges we find prejudice on the ground his attorney, while hampered by conflicting obligations to Tanenbaum and to Lerch, could not properly cross-examine a government witness, Erwin Saxl, in a manner best suited to advance Tanenbaum's defense. He claims his attorney was handicapped because certain aspects of Saxl's testimony which might exculpate Tanenbaum—that Saxl had dealt with a Biltmore salesman whose name began with "L"—tended to inculpate Lerch.

The record, however, does not support Tanenbaum's contentions. His attorney fully cross-examined the witness Saxl and made no request for severance or other relief at that time. It was only later, after the witness Dickinson had completed his direct testimony, that Tanenbaum's attorney stated a conflict of interest between his two clients was "now coming to the fore quite rapidly." After some discussion, the trial court granted counsel's motion for a mistrial as to Lerch, thereby promptly eliminating any possible obstacle to counsel's full and vigorous representation of Tanenbaum.

## IV

Scheftel contends the evidence establishes, as a matter of law, that he withdrew from the conspiracy prior to the five-year period prescribed by 18 U.S.C. § 3282 and that, therefore, his conspiracy conviction cannot stand. Because the grand jury returned the indictment on October 6, 1964, the crucial date with respect to this limitations claim is October 6, 1959.

It is undisputed that Scheftel first associated himself with Biltmore as a registered representative on March 17, 1959, and that he left its employment in June, 1959. Upon his resignation, the National Association of Securities Dealers, which had licensed him as a registered representative, was notified, and Biltmore sent letters to all his customers, informing them of his departure. There is no question that his co-conspirators knew of his withdrawal from Biltmore's operations.

■ The burden of establishing an effective withdrawal from a conspiracy rests upon the defendant, United States v. Markman, 193 F.2d 574, 576 (2 Cir.), cert. denied, Livolsi v. United States, 343 U.S. 979, 72 S.Ct. 1079, 96 L.Ed. 1371 (1952); United States v. Compagna, 146 F.2d 524, 527 (2 Cir. 1944), cert. denied, 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422 (1945); and the mere cessation of activity in furtherance of the conspiracy is not sufficient to carry this burden and to start the running of the statute. United States v. Borelli, 336 F.2d 376, 388 (2 Cir. 1964), cert.

denied, Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). But in Scheftel's case there is more than the mere absence of evidence of activity after the cutoff date; there is uncontroverted, affirmative evidence that Scheftel abandoned the illegal enterprise "in a manner reasonably calculated to reach co-conspirators." United States v. Borelli, supra.

The government seeks to avoid the force of this evidence by relying on the so-called "time bomb" analogy, to which the trial judge referred in his charge and which is derived from a footnote in the *Borelli* opinion:

> * * * When conspirators have set a dynamite machine with a timed fuse in position to blow up a building and go away and leave it to do its destructive work in due course of time, they are continuing in their purpose and are in the actual execution of that purpose every moment of time until the machine explodes.

United States v. Borelli, supra, 336 F.2d at 388, n. 8. The government claims this proposition is applicable to Scheftel because his activities with respect to his "lead cards" prior to October 6, 1959, were fostered and expanded by Goldberg after that date. Thus, argues the government, conduct by Scheftel in furtherance of the conspiracy reached fruition within the statutory period and thereby justifies his conviction on the conspiracy count.

■ We disagree. The "lead cards" which the government contends Scheftel left behind "to do their destructive work" within the statutory period were not prepared by Scheftel, nor were they within his effective control. Goldberg compiled the cards in the first instance and although he distributed them daily to his salesmen, he took them back into custody each evening where they remained under his exclusive possession and control for possible later exploitation. Hence, unlike the pre-set dynamite machine to which *Borelli* alludes, the cards themselves would not necessarily produce an unlawful result; it would depend on what Goldberg did with them in the future. The record discloses no evidence that any "loads" were placed with any one of Scheftel's customers after the cutoff date. Under these circumstances, we hold that Scheftel's withdrawal from the conspiracy months prior to October 6, 1959, entitled him to an acquittal under the statute of limitations as a matter of law.

## V

■ The appellants' remaining contentions merit only summary discussion. The claim that the evidence established the existence of multiple conspiracies and that the appellants were prejudiced by being tried together is wholly unpersuasive. There was ample proof that appellants engaged in a series of fraudulent acts which constituted essential steps in a single scheme to dupe the public. United States v. Benjamin, 328 F.2d 854, 864 (2 Cir.), cert denied Howard v. United States, 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1954); United States v. Agueci, 310 F.2d 817, 826–827, 99 A.L.R.2d 478 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1016, 10 L.Ed.2d 12 (1963); Hayes v. United States, 329 F.2d 209, 215–218 (8 Cir.), cert. denied, Bennett v. United States, 377 U.S. 980, 84 S.Ct. 1883, 12 L.Ed.2d 748 (1964).

■ We are equally unconvinced that the trial court erred in failing to give interim instructions to the jury during the presentation of the government's case. Under the circumstances here, no such instructions were required. See United States v. Miller, 381 F.2d 529 (2 Cir. 1967); United States v. Ragland, 375 F.2d 471 (2 Cir. 1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968); United States v. Nuccio, 373 F.2d 168 (2 Cir.), cert. denied, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967). The charge as a whole meticulously defined the essential elements of the crime of conspiracy and carefully instructed the jury that the guilt or innocence of each defendant must be individually determined.

The judgments of conviction are affirmed as to Goldberg, Tanenbaum and Teret; the judgment of conviction as to Scheftel is reversed and remanded for the entry of a judgment of acquittal.