**UNITED STATES of America,**
**Appellee,**

**v.**

**Ernest GALLISHAW, Defendant-**
**Appellant.**

**No. 292, Docket 32940.**

United States Court of Appeals,
Second Circuit.

Argued April 28, 1970.

Decided June 8, 1970.

Phylis Skloot Bamberger, New York City (The Legal Aid Society, Milton Adler, New York City, on the brief), for defendant-appellant.

David G. Trager, Asst. U. S. Atty. (Edward R. Neaher, U. S. Atty., for the Eastern District of New York, on the brief) for appellee.

Before HAYS, ANDERSON and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Ernest Gallishaw appeals from his conviction of conspiring to rob a bank, 18 U.S.C. § 371, after a jury trial in the United States District Court for the Eastern District of New York, Jacob Mishler, C. J. Because of a basic error in a supplemental charge to the jury, we conclude that we must reverse the conviction.

Appellant was indicted with five other defendants in a four-count indictment and was tried on Counts One, Two and Four. Counts One and Two charged him with substantive crimes in the robbery of a named bank in Queens, 18 U.S.C. §§ 2113(a), (d) and 2. On these counts, after an eight-day trial, the jury failed to agree. On Count Four, which contained the conspiracy charge, appellant was convicted. Two other defendants, Otis Thompson, also known as Thomas, and Wigberto Carballo, pleaded guilty to Count One; another defendant, Manuel Marrero, was tried with appellant.

The chief government testimony connecting appellant with the crimes charged was given by Carballo. He testified that on the morning of the robbery, he went with Thomas in a car driven by the latter to a poolroom in Brooklyn. Thomas went into the poolroom and came out accompanied by appellant, who got into another car. Both cars were then driven to a drug store. Thomas and Gallishaw got out of their cars and went into the drug store; Thomas returned and asked Carballo for the registration for the car, which was in the glove compartment. Carballo handed the registration through the window to Thomas who went back into the drug store. In a few minutes, Thomas and Gallishaw came out. Carballo heard them talking and testified as follows:

Q. What was said?

\* \* \* \* \* \*

A. Mr. Gallashaw [*sic*] said, "Make sure you bring it back," and Thomas said that he will be sure that he will bring it back and if he didn't pull the bank job, "I will pull something else to give him the money."

The cars were then driven back to where Thomas first picked up Gallishaw. The latter obtained a briefcase which he then put in the trunk of Thomas's car. Thom-

as and Carballo then went to the home of Silva, a co-conspirator, where the brief case was opened. It contained a machine gun which was actually used later that day to rob the bank in Queens. Thomas told Silva that he had obtained the gun from Gallishaw.

Carballo's testimony was attacked vigorously on cross-examination but this need not concern us. It was not incredible as a matter of law and the jury showed by its verdict that his story was accepted, at least in substantial part. Appellant took the stand and denied that he had anything to do with the bank robbery, claiming that he was at work that day in an OEO-sponsored project. The jury obviously did not credit this testimony and believed that Gallishaw did supply a machine gun to Thomas. The jury was puzzled, however, by one of the fine points in the law of conspiracy, and it was the handling of this aspect of the case that requires reversal.

## I.

In his charge to the jury, the judge defined the elements of the substantive crimes charged in Counts One and Two and the conspiracy charged in Count Four. During its deliberation, the jury sent the following note to the judge:

> Does the supplying or renting of a gun, which is subsequently used in a bank robbery, constitute grounds for a conspiracy if the person who rents the gun doesn't know how or where the gun will be used?

The judge answered the question:

> Well, I charge you that it isn't necessary for the Government to prove that the one who rented the gun knew precisely what was intended or all the objectives of the conspiracy or the specific objectives of the conspiracy, or how the gun was to be used. But if you find that the defendant rented the gun and understood and knew that there was a conspiracy to do something wrong and to use the gun to violate the law, you may find that he willfully entered the conspiracy.

Now, of course, that element must be proved beyond a reasonable doubt. If that is all the evidence that the Government has established, you must be satisfied that by that evidence the Government has proved beyond a reasonable doubt that he entered the conspiracy willfully and knowingly. And willfully and knowingly, as I charged you, means that he entered it intentionally and with the specific knowingly [*sic*] and with the specific intent to do something which the law forbids. That means to violate some law.

Defense counsel objected to this answer after it was given, but the supplemental charge remained uncorrected. Thereafter, the jury convicted appellant of conspiracy under Count Four, although it was unable to agree on Counts One and Two, which charged him with aiding and abetting the commission of the substantive crimes.

On appeal, we are thus faced with the following situation. The Government's witness, Carballo, testified that when Gallishaw handed over the machine gun, Thomas said he would either "pull the bank job" or "pull something else" with it. This imprecision about both Thomas's intentions and Gallishaw's knowledge of them apparently bothered the jury and led it to inquire about the possibility of participation in a conspiracy "if the person who rents the gun doesn't know how or where the gun will be used." It may be that the jury was asking only whether a conspirator had to know about specific places and times. However, it is at least as likely that this jury, which failed to convict Gallishaw on the substantive offense counts, was asking whether a weapon supplier who knew in a general way that a machine gun was to be used to "pull something" could be said to have joined a conspiracy to rob a bank. The judge answered, in the press of the moment, that the jury could convict if Gallishaw rented the gun with the knowledge "that there was a conspiracy to do something wrong and to use the gun to violate the law." The jury was thus

told, in a singularly pointed way, that it could convict on the conspiracy count without deciding whether to believe Carballo's testimony that Thomas had specifically mentioned a possible bank robbery to Gallishaw along with his generalized statement about pulling something.

Under this instruction, the jury may simply have drawn the perfectly reasonable inference that one who rents a machine gun knows it is likely to be used "to do something wrong" or "to violate the law," and therefore convicted Gallishaw, totally without regard to anything Thomas said, of the conspiracy charged in the indictment. A verdict on such a basis would have been improper. In Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959), the Supreme Court stated:

> "[C]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." [Footnote omitted.]

■■ On this record, to convict Gallishaw for the substantive crime of aiding and abetting a violation of 18 U.S.C. § 2113(a), the Government would have had to show at a minimum that he knew that a bank was to be robbed.[1] To convict him of conspiracy, at the very least no less was required. Cf. Nelson v. United States, 415 F.2d 483 (5th Cir. 1969), cert. denied, 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970); Lubin v. United States, 313 F.2d 419 (9th Cir. 1963); Twitchell v. United States, 313 F.2d 425 (9th Cir. 1963); United States v. Buffalino, 285 F.2d 408, 415–416 (2d Cir. 1960). See generally Wechsler, Jones & Korn, Treatment of Inchoate Crimes in the Model Penal Code, 61 Colum. L. Rev. 958, 972–75, 988–93

(1961). Therefore, the charge here was fatally defective. To be sure, as the Court pointed out in *Ingram*, a conspiracy may have multiple objectives and one who joins it commits a federal offense if "even a minor one" of these is to do an act which perpetrates a federal crime. 360 U.S. at 679–80, 79 S.Ct. 1314. But the jury must be told that the alleged conspirator must have knowledge of that "minor" objective in order to agree to it, *id.*, see United States v. Crimmins, 123 F.2d 271, 273 (2d Cir. 1941), although, of course, such knowledge may be inferred from the circumstances.

■■ The Government argues to us that we should not reverse because there was no proper objection to the supplemental charge and because, in any event, the jury verdict showed that it accepted Carballo's testimony that Gallishaw knew that a bank robbery was intended. As to the former, we cannot in good conscience say that defense counsel's objection in the heat of trial was insufficient, albeit not as precisely made as now, many months later and in a calmer atmosphere. As to the latter argument, the point is that the jury was not required to accept all of Carballo's testimony just because it accepted part of it; indeed, the jury's note may have indicated doubt over whether Thomas mentioned "the bank job" to Gallishaw. As already indicated, it may well be that the jury, understanding that Gallishaw had to know that a bank would be robbed, was asking whether Gallishaw was also required to be familiar with the details of the proposed robbery including the name of the bank. But that would be sheer speculation on our part and is contrary to the implications of some collo-

---

1. See United States v. Gargulio, 310 F.2d 249, 252–53 (2d Cir. 1962), which explicitly notes that the requirement of knowledge is usually assumed; the problem there concerned how much more than knowledge or presence is required to convict for aiding and abetting. Again, where the person prosecuted is the principal, the issue of guilty knowledge is further subsumed in the related question of whether knowledge of specific elements of the crime is required. See Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1951). The point is that defendant here had to know what kind of criminal conduct was in fact contemplated.

quy the judge had with counsel, in which the judge said:

> I think the jury may find from that alone that they are going to use it for criminal purposes. We don't use machine guns to knock down clay pipes.

This indicates a belief by the judge that knowledge by Gallishaw of any criminal purpose would be enough to justify conviction on the conspiracy count. As indicated, we do not think that was a proper statement of the law; if the jury had the same misconception, the verdict was improperly reached. Since we cannot tell what the jury thought in the face of the erroneous supplemental charge, we must order a new trial.

## II.

Since we conclude that reversal is called for, we do not, with one exception, reach the other allegations of error. The exception concerns the use over the objection of the defense, of what the defense calls a special verdict. Because this raises a basic and recurring problem in the administration of criminal justice in the circuit, we feel obliged to discuss it.

To aid the jury in its deliberations the trial judge gave the jury a form which summarized the various counts of the indictment. Thus, Count Four was referred to as follows:

| Defendants Charged | Nature of Charge | Essential Elements |
|---|---|---|
| GALLISHAW<br><br>MARRERO | On or about and between the 6th day of August and the 10th day of August, 1967, conspiracy of defendants and Otis Thompson, Wigberto Carballo, Tony Silva and Willie Philpot to commit bank robbery in violation of 18 U.S.C. §§ 2113 (a) and (d). | Willful association and participation in the criminal venture in violation of 18 U.S.C. § 371.<br><br>1. Conspiracy described in indictment was willfully formed and existing at or about the time alleged.<br><br>2. The accused willfully became a member of the conspiracy.<br><br>3. That one of the conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment at or about the time and place alleged.<br><br>4. That such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged. |

### VERDICT

| | | |
|---|---|---|
| ERNEST GALLISHAW | -------- GUILTY | -------- NOT GUILTY |
| MANUEL MARRERO | -------- GUILTY | ------- NOT GUILTY |

Appellant claims that this document called for a special verdict from the jury in a criminal case over his objection and therefore violated his constitutional right to trial by jury. The Government maintains that the procedure used cannot properly be called a special verdict and in any event did not prejudice appellant.

In recent years, there has been little discussion in legal literature or in opinions about the use of special verdicts in criminal cases, probably because the practice is comparatively rare. United States v. Spock, 416 F.2d 165 (1st Cir. 1969), contains an illuminating analysis of the problem, as does the opinion of Judge Palmieri some 12 years before in United States v. Ogull, 149 F.Supp. 272 (S.D.N.Y. 1957), aff'd sub nom. United States v. Gernie, 252 F.2d 664 (2d Cir.), cert. denied, 356 U.S. 968, 78 S.Ct. 1006, 2 L.Ed.2d 1073 (1958), without discussion of this point. In the latter case, the judge did submit to the jury, along with a form for a general verdict, questions as to whether participation of the two defendants in a conspiracy continued in August 1956 and whether certain overt acts occurred in August and September of that year. But the defendants in *Ogull* acquiesced in the procedure, and the need for a special verdict dealing with the times of conspiracy and overt acts was unique; because of a change in the statute, the penalties might vary depending upon the answer to the questions asked. The case is therefore clearly distinguishable. But appellant claims that both the *Spock* decision and Gray v. United States, 174 F.2d 919 (8th Cir.), cert. denied, 338 U.S. 848, 70 S.Ct. 90, 94 L.Ed. 519 (1949), are squarely in point and that each strongly disapproved of special verdicts in criminal cases, at least where a defendant objects. Asserting that we have never directly ruled upon the constitutionality of a special verdict in that context, appellant asks us to do so now.

█ We decline that invitation because we do not think that this case squarely raises the issue. As we see it, the trial judge here did not require the

jury to render a special verdict. The only verdict called for was a general one of guilty or not guilty for each defendant. What the judge submitted to the jury for its guidance amounted to a checklist and summary of the charges against Gallishaw and Marrero. In United States v. Bozza, 365 F.2d 206, 225 (2d Cir. 1966), we approved a procedure under which "The judge gave the jurors a four-page précis of the counts of the indictment submitted for their verdict rather than sending the full text as he could properly have done." The argument was made there that "the summary omitted some essential elements of the crimes," e. g., venue. But we refused to find error because "in his charge the judge read each count and fully explained what the jury must find in order to convict." Indeed, we said that "the expedient adopted was commendable in promoting informed consideration by the jury." *Id.* We reached similar conclusions in United States v. Goldberg, 401 F.2d 644, 648 (2d Cir. 1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969), 394 U.S. 932 (1969), and in United States v. Swan, 396 F.2d 883, 886 (2d Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968). In the latter, Chief Judge Lumbard wrote:

> Providing the jury with a list of the counts of an indictment as an aid to informed consideration by the jury is clearly proper, and usually very desirable where a multiplicity of counts are submitted for verdict. United States v. Bozza, 365 F.2d 206, 225 (2d Cir. 1966). While the summary handed to the jurors did not contain all of the essential elements of the crime, the judge carefully instructed the jury as to what it must find in order to convict and carefully read the indictment in full. The jury was also instructed that the summary was not evidence but only a summary of the indictment. Furthermore, the defendant was given an opportunity to have a copy of the indictment substituted for or accompany the précis and declined both options. Under these circumstances, it was a sound

exercise of the trial court's discretion to provide the jury with the list describing the counts in the indictment on which they were to render a verdict.

It is true that the document used here differs somewhat from those submitted to the jury in the above cited cases. The form here, in addition to a description of the nature of the charge, had a separate column for "Essential Elements" of the crime, which it numbered. In *Goldberg*, which was a complicated securities and mail fraud case, each count was identified by the defendant involved, the alleged mailing date, the name of the person defrauded, and the number of shares of stock involved; in addition, the counts on which there was a statute of limitations question were indicated. In *Swan*, the defendant had been engaged in fraudulently ordering goods by mail from various vendors; the form listed the many counts and identified them by reference to the type of use of the mails by the defendant, e. g., postcard, the date of his mailing and the vendor of the item. Finally, the form in *Bozza* was closer to the one used here, since it contained, as to each count, a shortened form of the allegations in the indictment, the name of the defendant involved, and a place to check guilty or not guilty.[2]

■ The common element in all of these documents is that the trial judge in each case obviously regarded the form as a summary of the charges contained in the indictment, as Judge Mishler did here.[3] Obviously, labels do not control, but the judge's intention is certainly not irrelevant when examining the impact on the jury. The form used here in some re-spects included less information than those just discussed; e. g., there was no reference to the testimony of any witness. However, in some respects it went further. Nevertheless, we think it was still esssentially a summary of the indictment of the sort we have already approved rather than a special verdict. It is true that listing and numbering the essentials of the crime has a superficial resemblance to the "catechizing" of the jury, with which the *Spock* court was concerned, 416 F.2d at 182. But unlike the situation in *Spock*, no juror here was required to answer any question other than the general one of guilt or innocence of a particular defendant. Appellant also argues that the failure of the form to list those aspects of the charge which protected defendant, such as the Government's burden of proof, was a major one. However, under *Bozza*, this omission does not require us to reverse so long as the oral charge on these matters was adequate. We do think, however, that dangerous territory is approached when the form to be taken into the jury room emphasized various elements of what the Government is required to prove by labelling them "essential" and by numbering them; we would not recommend going beyond paraphrasing of the indictment and the type of form used in *Bozza, Swan* and *Goldberg*.

There are no other issues which require discussion. In conection with any retrial, we point out that the cross-examination of appellant and the reference to his OEO project supervisor skirted the limits of the impermissible.

Judgment reversed for further proceedings consistent with this opinion.

---

2. The following was typical:

### Count Five

On or about March 13, 1964, defendant Daniel Bozza aided and abetted Bedrich Pollak and Frank Polak in receiving and retaining stamps stolen from the United States Post Office at Keyport, New Jersey, of a value of approximately $5,517.00 with intent to convert said stolen stamps to their own use, knowing the same to have been stolen.

Daniel Bozza . . . Guilty _____
                                    Not Guilty _____

3. Although the judge called the form a "special verdict," he described it as "in effect a summary of the charges," and he relied on this court's approval of the form he had used in *Bozza, supra*.