UNITED STATES of America, Appellee,

v.

**Gilberto GIRALDO, Andres Emilio Fermin, and Jose Angel Tellez, Defendants–Appellants.**

**Nos. 872, 1048, 842, Dockets 94–1713(L), 95–1005, 95–1382.**

United States Court of Appeals, Second Circuit.

Argued Jan. 17, 1996.

Decided March 25, 1996.

Ilene Jaroslaw, Assistant United States Attorney, Brooklyn, New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, Susan Corkery, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

B. Alan Seidler, Nyack, New York, for Defendant–Appellant Giraldo.

Harvey B. Baum, New York City, for Defendant–Appellant Fermin.

Jeffrey M. Cohn, New York City, for Defendant–Appellant Tellez.

Before: KEARSE, WALKER, and HEANEY *, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Gilberto Giraldo, Andres Emilio Fermin, and Jose Angel Tellez appeal from judgments of the United States District Court for the Eastern District of New York, Denis R. Hurley, *Judge,* convicting them of distributing and conspiring to distribute narcotics, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1994), and 18 U.S.C. § 2 (1994); and of using or carrying a firearm during and in relation to narcotics trafficking, in violation of 18 U.S.C. § 924(c) (1988 & Supp. II 1990) and 18 U.S.C. § 2. Fermin was also convicted of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (1988 & Supp. II 1990). On the narcotics counts, Giraldo, Fermin, and Tellez were sentenced to prison terms of 188 months, 108 months, and 78

months, respectively; on the § 924(c) count of using or carrying a gun in connection with narcotics trafficking, each defendant was sentenced to 60 months' imprisonment, to be served consecutively to his prison term on the narcotics counts; each defendant's prison term was to be followed by a five-year term of supervised release.

On appeal, all three defendants principally challenge the sufficiency of the evidence to support their convictions under § 924(c), and Giraldo and Fermin challenge the sufficiency of the evidence to support their convictions on the narcotics counts. In light of the Supreme Court's recent decision in *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), we reverse the convictions of Giraldo and Tellez under § 924(c), and we remand for dismissal of those counts and for resentencing in light of the dismissals. In all other respects, we affirm.

## I. BACKGROUND

The present prosecution centered on events that culminated in the arrests of Giraldo, Fermin, and Tellez at the scene of an attempted narcotics transaction in Hempstead, New York, in early 1994. The evidence at trial included testimony by law enforcement agents and by government informant Blaise Gibson, tape-recorded conversations, a videotape of the attempted transaction, narcotics, and a firearm found in the car in which defendants brought the narcotics. Viewed in the light most favorable to the government, the evidence included the following.

Gibson began selling drugs in the late 1980s and began to use Giraldo as his exclusive supplier in 1988 or 1989. Starting in 1989, he contacted Giraldo to make purchases at intervals of two weeks to two months. Giraldo usually delivered the drugs to Gibson in the parking lot of a "Wings 'N Things" restaurant in Hempstead. In November 1993, Gibson was arrested on federal narcotics charges, and he agreed to cooperate with the Federal Bureau of Investigations ("FBI") in an investigation of Giraldo.

* Honorable Gerald W. Heaney, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

In February 1994, acting on the instructions of FBI Special Agent Stuart McArthur, Gibson telephoned Giraldo from the Metropolitan Correctional Center in Manhattan. Gibson said he would be coming home soon and would have more business for Giraldo. On March 2, in a coded conversation explained by Gibson at trial, Giraldo agreed to sell Gibson two kilograms of cocaine for $45,000. Later that day, Giraldo called Gibson on his beeper; when Gibson returned the call, Giraldo informed him that the transaction would be delayed because delivery of the cocaine to Giraldo had been held up due to bad weather. Additional calls followed, in which Giraldo confirmed further delays. At 8:41 p.m. on March 3, Giraldo called to say that he was leaving right away to pick "it" up and indicated that he would page Gibson's beeper when Giraldo was 10 minutes away from Wings 'N Things.

When Gibson received the promised page, he was en route to meet McArthur and other law enforcement agents. The agents searched Gibson and his car and equipped him with a radio transmitter and a tape recorder. Gibson then proceeded to Wings 'N Things.

During the afternoon of March 3, law enforcement agents had observed Giraldo enter a building in Queens, New York. Shortly before 9:00 p.m., Giraldo emerged accompanied by Fermin. Both were empty-handed. They got into a two-door Pontiac Grand Prix (the "Pontiac") that was parked on the street, and, with Fermin driving, went to an indoor parking garage a few blocks away. After about five minutes, Giraldo and Fermin exited the garage in the Pontiac, with Tellez now in the back seat. The men drove to the Southern State Parkway and proceeded toward Hempstead. At about 9:30 p.m. they pulled into a rest area where Giraldo used a pay telephone for 15–20 seconds. Some 10 minutes later, defendants arrived at the Wings 'N Things parking lot. The Pontiac moved slowly through the parking lot; Gibson was not yet there, and the Pontiac left.

Seven or eight minutes later, Gibson arrived. After another 10–15 minutes, the Pontiac returned, still with Fermin at the wheel, Giraldo in the front passenger seat,

and Tellez in the back. Gibson walked to the passenger side of the Pontiac; Giraldo opened the door and reached around behind him; Tellez removed from under the seat a large package which he gave to Giraldo; the package proved to contain two kilograms of cocaine. Giraldo handed the package to Gibson, who asked whether it was "one or two," to which Giraldo responded "two, number one material." He told Gibson to "hurry up," meaning that Gibson should quickly test the quality of the cocaine and return with the purchase money. Fermin, from the driver's seat, peered intently at Gibson during the transaction.

Gibson walked away, and defendants got out of the Pontiac. Gibson took off his hat as a signal to the agents, and moments later, defendants were placed under arrest. In searching Fermin, the agents found, *inter alia*, a wallet containing a vehicle registration and an insurance card for the Pontiac. These documents listed the owner of the Pontiac as one Miguel Zuluaga; however, the address shown for Zuluaga turned out to be only a "mail drop," and no such person was ever located.

In a later search of the Pontiac at police headquarters, a fully loaded and ready-to-fire semiautomatic 9-millimeter gun, with its serial number defaced, was found. The searching officer discovered the gun some 15 minutes into his search, after noticing that the change dish in the console between the two front seats seemed loose. He pulled up the change dish and saw the butt of a gun in the cavity below; the gun was not visible unless the dish was removed. The officer was able to lift the change dish out easily with one hand while sitting in the driver's seat.

Giraldo, Fermin, and Tellez were indicted on the narcotics and firearm charges described above, were convicted on all counts, and were sentenced as indicated above. These appeals followed.

## II. DISCUSSION

On these appeals, defendants principally challenge the sufficiency of the evidence to support their convictions of using or carrying a firearm in violation of § 924(c). Giraldo

and Fermin also contend that the evidence was insufficient to support their convictions of conspiracy to distribute narcotics; and all defendants make various individual challenges to their convictions or sentences. For the reasons below, we find merit only in some of the § 924(c) contentions.

## A. Sufficiency of the Evidence on the Narcotics Counts

Giraldo contends that his conspiracy conviction should be overturned because it was against the weight of the evidence. Fermin contends that the evidence showed only that he was present at the time Giraldo handed the cocaine to Gibson, not that he was guilty of conspiracy. Their contentions have no merit.

■■■■ In order to prove a conspiracy, the government must present " 'some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.' " *United States v. Sanchez Solis,* 882 F.2d 693, 696 (2d Cir.1989) (quoting *United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984)). Both the existence of the conspiracy and a given defendant's participation in it with the requisite criminal intent may be established through circumstantial evidence. *See, e.g., United States v. Villegas,* 899 F.2d 1324, 1338–39 (2d Cir.), *cert. denied,* 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); *United States v. Tutino,* 883 F.2d 1125, 1129 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990). Although a defendant's "mere presence" at the scene of a crime will not be enough to show that he was a member of the conspiracy, *United States v. Soto,* 716 F.2d 989, 991–92 (2d Cir.1983), his presence may establish his membership in the conspiracy if all of the circumstances considered together show that by his presence he meant to advance the goals of that conspiracy, *see, e.g., United States v. Gordils,* 982 F.2d 64, 71 (2d Cir.1992), *cert. denied,* 507 U.S. 1054, 113 S.Ct. 1953, 123 L.Ed.2d 657 (1993). Further, a "defendant's participation in a single transaction can, on an appropriate record, suffice to sustain a charge of knowing participation

in an existing conspiracy," *United States v. Miranda–Ortiz,* 926 F.2d 172, 176 (2d Cir.), *cert. denied,* 502 U.S. 928, 112 S.Ct. 347, 116 L.Ed.2d 287 (1991); *see also United States v. Zabare,* 871 F.2d 282, 287 (2d Cir.), *cert. denied,* 493 U.S. 856, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989), if the other evidence permits an inference that the defendant had knowledge of the conspiracy and intended to join, *see, e.g., United States v. Miranda–Ortiz,* 926 F.2d at 176.

■■■■ In challenging the sufficiency of the evidence to support his conviction, a defendant bears a heavy burden. In reviewing such a challenge, we view the evidence "in the light most favorable to the government," *United States v. Gordon,* 987 F.2d 902, 906 (2d Cir.1993), drawing all inferences and resolving all issues of credibility in the government's favor, *see, e.g., United States v. Weiss,* 930 F.2d 185, 191 (2d Cir.), *cert. denied,* 502 U.S. 842, 112 S.Ct. 133, 116 L.Ed.2d 100 (1991). "[P]ieces of evidence must be viewed in conjunction, not in isolation," *United States v. Podlog,* 35 F.3d 699, 705 (2d Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 954, 130 L.Ed.2d 897 (1995), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *see, e.g., United States v. Buck,* 804 F.2d 239, 242 (2d Cir.1986); *United States v. Taylor,* 464 F.2d 240, 244–45 (2d Cir.1972). The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal. *See, e.g., United States v. Roman,* 870 F.2d 65, 71 (2d Cir.), *cert. denied,* 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989). These principles apply whether the evidence being reviewed is direct or circumstantial. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942).

■■■ Giraldo and Fermin have not met their burdens. The jury could infer from Giraldo's many telephone conversations with Gibson that Giraldo had one or more supplier-coconspirators who were to deliver the cocaine to him. When Giraldo and Fermin went to the Pontiac on the evening of March 3, they were empty-handed. The jury was entitled to infer that Giraldo would not have

left two kilograms of cocaine worth $45,000 in an untended car on the street; hence it was reasonably inferable that Tellez, whom Giraldo and Fermin picked up in the garage, brought the cocaine. When Tellez handed the cocaine to Giraldo at the meeting with Gibson, he did so without any conversation with Giraldo or Fermin. We conclude that the evidence was sufficient to permit a rational juror to infer that Giraldo and Tellez conspired to sell the cocaine to Gibson.

■■■ The jury was also entitled to infer that Fermin was a coconspirator and not just an innocent bystander. The record included not only the evidence that Fermin drove Giraldo to pick up Tellez with the cocaine and drove Giraldo and Tellez to meet Gibson to make the sale; it included evidence that Fermin had supplied the Pontiac for the trip, and that he intently watched Gibson during the transaction, with a loaded and ready-to-fire semiautomatic gun, with a defaced serial number, within his easy reach. Though Fermin argued that there was no evidence that the car was his, the jury was entitled to infer otherwise from the facts that the address for Miguel Zuluaga, who was listed as owner on the registration and insurance documents, was merely a mail drop, and that no Miguel Zuluaga was ever located.

Taken in the light most favorable to the government, the evidence was sufficient to permit a rational juror to infer beyond a reasonable doubt that Giraldo, Fermin, and Tellez were coconspirators.

### B. *Sufficiency of the Evidence on the Firearm Counts*

To the extent pertinent here, § 924(c) imposes a mandatory five-year term of imprisonment on any person who "during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm." 18 U.S.C. § 924(c)(1). Thus, although the indictment charged that defendants "use[d] *and* carr[ied]" the gun (Indictment ¶3 (emphasis added)), defendants could properly be convicted under § 924(c) if, in connection with their attempted sale of cocaine to Gibson, they either used or carried a firearm. See generally *United States v. Schiff*, 801 F.2d 108, 114 (2d Cir.1986) (indict-

ments worded in the conjunctive, charging violations of statutes that are worded in the disjunctive, can be supported by proof of either of the conjoined means of violating the act, and the court may properly charge the jury in the disjunctive), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1987).

#### 1. *"Use"*

Prior to late 1995, this Court had interpreted "use" of a firearm within the meaning of § 924(c) to include mere possession of a gun in circumstances that suggested that the defendants kept it available in case it were needed in connection with their narcotics trafficking. *See, e.g., United States v. Torres,* 901 F.2d 205, 217–18 (2d Cir.) (gun under mattress in apartment in which narcotics were found and to which narcotics were to be delivered), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *United States v. Alvarado,* 882 F.2d 645, 653–54 (2d Cir.1989) (guns strategically located in apartment in which narcotics were processed and stored, including two guns in safe along with some $3,000 in cash), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1990); *United States v. Meggett,* 875 F.2d 24, 26, 29 (2d Cir.) (five undisplayed guns in various places in apartment in which narcotics were processed and distributed), *cert. denied,* 493 U.S. 858, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989). We reasoned that the strategic placement of guns in narcotics trafficking locations constituted "use" because their possessors felt weapons could be needed to protect their wares or the proceeds from their sales.

In *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) ("*Bailey*"), the Supreme Court held that the word "use" in § 924(c) must be read more narrowly. Rejecting the government's contention that "possession amounts to 'use' because possession enhances the defendant's confidence," the Court held that " 'use' must connote more than mere possession of a firearm by a person who commits a drug offense" and means more than mere "proximity and accessibility." —— U.S. at ——, 116 S.Ct. at 506 (internal quotation marks omitted).

Under the Government's reading of § 924(c)(1), "use" includes even the action of a defendant who puts a gun into place to protect drugs or to embolden himself. This reading is of such breadth that no role remains for "carry."... Nothing here indicates that Congress, when it provided these two terms, intended that they be understood to be redundant.

....

.... In § 924(c)(1), ... liability attaches only to cases of actual use, not intended use, as when an offender places a firearm with the intent to use it later if necessary.

—— U.S. at ——, 116 S.Ct. at 507.

The *Bailey* Court held that satisfaction of the "use" prong of "§ 924(c)(1) requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." —— U.S. at ——, 116 S.Ct. at 505 (emphasis in original). As examples, the *Bailey* Court stated that

[t]he active-employment understanding of "use" certainly includes brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a firearm. We note that this reading compels the conclusion that even an offender's reference to a firearm in his possession could satisfy § 924(c)(1). Thus, a reference to a firearm calculated to bring about a change in the circumstances of the predicate offense is a "use," just as the silent but obvious and forceful presence of a gun on a table can be a "use."

—— U.S. at ——, 116 S.Ct. at 508. In contrast, the Court stated that a gun cannot be said to be "used" within the meaning of § 924(c)(1) merely on the basis that its

presence emboldens or protects its owner.... [T]he inert presence of a firearm, without more, is not enough to trigger § 924(c)(1). Perhaps the nonactive nature of this asserted "use" is clearer if a synonym is used: storage. A defendant cannot be charged under § 924(c)(1) merely for storing a weapon near drugs or drug proceeds. Storage of a firearm, without

its more active employment, is not reasonably distinguishable from possession.

... [W]here an offender conceals a gun nearby to be at the ready for an imminent confrontation .... [s]ome might argue that the offender has "actively employed" the gun by hiding it where he can grab and use it if necessary. In our view, "use" cannot extend to encompass this action. If the gun is not disclosed or mentioned by the offender, it is not actively employed, and it is not "used."

—— U.S. at ——, 116 S.Ct. at 508.

In the present case, the government's proof did not establish that defendants "used" the gun within the meaning of § 924(c). There was no evidence that any of the defendants made any reference to the gun during delivery of the cocaine to Gibson. Further, Gibson did not testify that the gun was visible as he stood outside the Pontiac. One of the officers on the scene testified that after the arrests the officers made a quick visual search of the car, but no gun was visible. Another officer drove the car to police headquarters; he did not find the gun. The gun was not found until yet another officer made a thorough 15–minute search of the car at police headquarters. The officer who found the gun did so only after noticing that the change receptacle in the center console was loose and removable. Neither the gun nor the cavity could be seen until the change dish was removed.

In sum, the gun was not fired, was not visible, and was not mentioned. Under the teaching of *Bailey*, the fact that it was hidden within reach of some of the defendants was insufficient to constitute its "use." The evidence was thus insufficient to convict any of the defendants of "using" the gun under § 924(c).

### 2. *"Carry"*

In ruling that "use" requires proof of a more active employment than having the gun concealed nearby, the *Bailey* Court suggested that in some circumstances, a defendant who "puts a gun into place to protect drugs or to embolden himself" may be said to be within § 924(c)'s prohibition against "carrying." —— U.S. at ——, 116 S.Ct. at 507.

Accordingly, we turn to the question of whether the evidence was sufficient to support defendants' convictions for carrying.

In *United States v. Feliz–Cordero,* 859 F.2d 250 (2d Cir.1988) (*"Feliz–Cordero"*), we held that a defendant could not be convicted of carrying a gun within the meaning of § 924(c) where the gun was found in a dresser drawer, and during the transaction in question it was not within reach of any of the defendants. We stated that "a person cannot be said to 'carry' a firearm without at least a showing that the gun is within reach during the commission of the drug offense." 859 F.2d at 253. If, however, during the predicate transaction a firearm was carried by, or was within reach of, one defendant but not another, that other defendant may be found liable for carrying the gun either on a *Pinkerton* theory, *see Pinkerton v. United States,* 328 U.S. 640, 646–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946) (a coconspirator who does not directly commit a substantive offense may be liable for that offense if it was committed by another coconspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement), or on an aiding-and-abetting theory.

As to the latter theory, a person cannot be convicted of aiding and abetting the commission of a crime without some knowledge of the proposed crime. *See, e.g., United States v. Gallishaw,* 428 F.2d 760, 763 (2d Cir.1970); *see also Nye & Nissen v. United States,* 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949) (aiding and abetting theory supports liability when the defendant "consciously shares in" the underlying criminal act); *United States v. Labat,* 905 F.2d 18, 23 (2d Cir.1990) (defendant must act with specific purpose of bringing about the underlying crime). A general suspicion that an unlawful act may occur is not enough. *See, e.g., United States v. Wiley,* 846 F.2d 150, 154 (2d Cir.1988); *United States v. Zambrano,* 776 F.2d 1091, 1097 (2d Cir.1985). Thus, "a defendant cannot aid and abet a § 924(c) violation without knowing (or having reason to know) that a gun will be used or carried in relation to the underlying crime." *United States v. Medina,* 32 F.3d 40, 46 (2d

Cir.1994). Though we have often noted that guns are among the common "tools" of the narcotics trade, *see, e.g., United States v. Crespo,* 834 F.2d 267, 271 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988), the simple fact that a defendant has participated in a narcotics transaction is not sufficient under § 924(c), in the absence of a proper *Pinkerton* charge, to impute to him knowledge that one of his confederates carried a gun.

In addition to requiring proof of knowledge for conviction of aiding and abetting, we have held that a defendant cannot be convicted of the use or carrying of a firearm in violation of § 924(c) on an aiding-and-abetting theory without "proof that he performed some act that directly facilitated or encouraged the use or carrying of a firearm." *United States v. Medina,* 32 F.3d at 45. Proof simply that a defendant knew that a firearm would be carried, even accompanied by proof that he performed some act to facilitate or encourage the underlying crime in connection with which the firearm was carried, is insufficient to support a conviction for aiding and abetting the carrying of a firearm; there must also be proof that the defendant performed some affirmative act relating to that firearm. *See id.* at 45–46.

Because the jury in the present case was not given a *Pinkerton* instruction, the application of these principles produces different results for Giraldo and Tellez, on the one hand, and Fermin, on the other.

#### a. *Giraldo and Tellez*

As to Tellez, the evidence on the "carry" prong of § 924(c) was plainly insufficient. Tellez was in the back seat of the Pontiac, and there was no evidence that he could have reached the gun in the cavity beneath the change dish from where he sat. Indeed, we note that in response to Tellez's motion for acquittal at trial, the government stated, "Mr. Tellez himself would not have in all likelihood been the one to put his finger on the trigger...." Nor was there sufficient evidence on which to sustain Tellez's § 924(c) conviction on an aiding-and-abetting theory, for we have been pointed to no evidence either that he knew the gun was present or

that he had performed any act to facilitate or encourage its presence.

■ As to Giraldo, the evidence was somewhat more favorable to the government, for Giraldo was sitting in the front passenger seat. The officer who found the gun testified that he was able to remove the change dish easily as he sat in the driver's seat. Although the government failed to present testimony as to the accessibility of the gun to a person sitting in the front passenger seat (the court sustained objections to such questions to one witness on grounds of form and lack of foundation, and the government did not pursue the inquiry further), photographs admitted at trial show that the cavity in which the gun had been placed was in the center console that was apparently equidistant from the driver's seat and the front passenger seat. Thus, it could reasonably be inferred that the gun was accessible to both Fermin and Giraldo. The difficulty with respect to Giraldo is that the government presented no evidence that he knew the gun was present. There was no evidence to suggest that the Pontiac belonged to Giraldo. For example, he was not the driver, and he did not have in his possession any documents of ownership. And, as discussed above, neither the gun nor the cavity itself was visible, and there was nothing obvious to suggest upon visual inspection that the change dish was loose or concealed a compartment.

In sum, we find in the record no evidence from which the jury could reasonably infer that Giraldo knew there was a gun in the car. Lack of proof of knowledge also forecloses affirmance on an aiding-and-abetting theory. Since no *Pinkerton* instruction was given, we conclude that the evidence was insufficient to support the convictions of Giraldo and Tellez under § 924(c) and that those convictions must therefore be reversed.

■ We note that the Sentencing Guidelines ("Guidelines") provide for a two-level increase in offense level "[i]f a dangerous weapon (including a firearm) was possessed." Guidelines § 2D1.1(b)(1). This adjustment "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Guidelines § 2D1.1 Application Note 3.

"The defendant need not have had personal possession, or even actual knowledge of the weapon's presence; the enhancement is required so long as the possession of the firearm was reasonably foreseeable to the defendant." *United States v. Stevens,* 985 F.2d 1175, 1188 (2d Cir.1993) (internal quotation marks omitted). In the present case, the district court declined to impose the § 2D1.1(b)(1) enhancement, reasoning that to do so in addition to imposing the mandatory sentence required for a § 924(c) conviction would be double-counting. The court should reconsider the applicability of the § 2D1.1(b)(1) enhancement in light of our reversal of the convictions under § 924(c).

### b. Fermin

■ As to Fermin, the evidence was sufficient to support his conviction of carrying a firearm in connection with the drug transaction. There is no question that the gun was brought to the meeting site in the Pontiac. The gun was within easy reach of Fermin, and he was, at the very least, the custodian of the car. In addition, at the time of his arrest he had a billfold containing the Pontiac's registration and insurance documents. Though those documents were in the name of "Miguel Zuluaga," the address on those documents was not a residence but a mail drop, and official efforts to locate such a person had proven fruitless. It was permissible for the jury to infer from Fermin's possession of the car, its keys, and its registration and insurance documents, and from the untraceability of Zuluaga, that there was no Zuluaga, that the car belonged to Fermin, and that Fermin had full knowledge of the car's contents. Further, since the gun in the cavity was oriented for easy grasping, was fully loaded, and had a live cartridge in its chamber, the jury was also entitled to infer that Fermin, who had not previously dealt with Gibson, and who peered intently at Gibson during the transaction, had the gun at the ready in order to safeguard the narcotics. We conclude that the evidence was sufficient to support Fermin's conviction under the "carrying" prong of § 924(c).

Fermin contends that even if the evidence of carrying was sufficient, he is entitled to a new trial on the § 924(c) count because the trial court's instructions were erroneous with respect to "use." Though we agree that the court's instructions included a statement that is flawed in light of *Bailey*, we conclude that the error was harmless. The flawed portion of the court's instructions stated:

> Under the statute, to *"use"* a firearm means to have the firearm available in such a way that it furthered the commission of the drug trafficking crime or was an integral part of the commission of the crime. It is not necessary that the government prove that the defendant fired or even displayed the weapon. As long as the defendant had the firearm available to protect his criminal endeavors if he needed to do so, that is sufficient to establish *use* of the firearm.

(Trial Transcript at 776–77 (emphases added).) There is no question that, in light of *Bailey*, this instruction is erroneous with respect to "use." However, *Bailey* suggested that a defendant may be convicted of "carrying" a firearm within the meaning of § 924(c) if he has "put[ ] a gun into place to protect drugs or to embolden himself," —— U.S. at ——, 116 S.Ct. at 507. And in *Feliz–Cordero*, while we overturned the "carrying" convictions of defendants who had no gun "within reach during the commission of the drug offense," we indicated that a "carrying" conviction would be upheld if a defendant who had narcotics in his possession had a loaded gun under his seat in an automobile. *See* 859 F.2d at 253–54 (citing *United States v. Brockington*, 849 F.2d 872 (4th Cir.1988)). Thus, the above instruction would have been consistent with *Bailey* and *Feliz–Cordero* had the court simply used the word "carry" in place of the first " 'use' " and "carrying" in place of the second "use." Indeed, in instructing the jury as to what was needed to find the defendants guilty of "carrying," the court employed much the same language as it had with respect to "using," stating that to "carry" a firearm under this statute means to have it within your control so that it was available in such a way that it furthered the commission of the drug traf-

ficking crime or was a[n] integral part of the commission of the crime. The defendant did not necessarily have to hold it physically, that is, have actual possession of it on his person. If you find that the defendant had dominion and control over the place where the firearm was located, and had the power and attention [*sic*] to exercise control over the firearm, you may find that the government has proven that the defendant carried the weapon.

(Trial Transcript at 777.) The court also informed the jury that the government was required to prove that the defendant in question had knowledge that the gun was in the car in which it had been transported to the scene of the attempted transaction.

Since defendants were charged with both using and carrying the gun in violation of § 924(c), and the court's description of the "use" prong would have been correct with respect to the "carry" prong, and since there was no question that the gun was brought to the meeting site in the Pontiac and was within easy reach of Fermin, we have no doubt that the court's erroneous instruction on "use" was harmless. Accordingly, we affirm the conviction of Fermin for "carrying" in violation of § 924(c).

## C.   *Other Contentions*

Defendants' other contentions include Giraldo's contention that his trial attorney rendered constitutionally ineffective assistance, Fermin's contention that he should have been granted a severance for trial, Tellez's contention that the trial court impermissibly curtailed his cross-examination of Gibson, and various sentencing challenges. These contentions are meritless. Only the sentencing challenges of (1) Giraldo with respect to the quantity of narcotics attributable to him, and (2) Fermin with respect to an obstruction-of-justice enhancement for perjury warrant discussion.

### 1.   *The Quantity of Narcotics Attributable to Giraldo*

In calculating Giraldo's base offense level under the Guidelines, the district court found that Giraldo's relevant conduct included dis-

tribution of between 15 and 50 kilograms of cocaine. Giraldo contends that it was error to take into account more than the two kilograms he tried to sell Gibson on March 3, 1994. We disagree.

■ The Guidelines provide that "in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct ... as the count of conviction." Guidelines § 1B1.3 Background. "[W]hether two or more transactions may be considered part of the same course of conduct is not determined by temporal proximity alone." *United States v. Santiago*, 906 F.2d 867, 872 (2d Cir.1990). Rather, the court should consider, *inter alia*, "the nature of the defendant's acts, his role, and the number and frequency of repetitions of those acts, in determining whether they indicate a behavior pattern." *Id.*; *see also* Guidelines § 1B1.3 Application Note 9(B). The determination as to whether several transactions are part of the same course of conduct is a factual one, and the district court's finding may not be overturned unless it is clearly erroneous. *See, e.g., United States v. Vazzano*, 906 F.2d 879, 883 (2d Cir.1990). Determinations as to the quantity of narcotics attributable to the defendant and as to the defendant's role in the offense likewise must be upheld unless clearly erroneous. *See, e.g., United States v. Cousineau*, 929 F.2d 64, 67 (2d Cir.1991); *United States v. Rios*, 893 F.2d 479, 481 (2d Cir.1990). The sentencing judge's assessments of the witnesses' credibility are entitled to deference. *See, e.g.*, 18 U.S.C. § 3742(e).

■ In the present case, the government contended that Giraldo had been responsible for distributing between 50 and 150 kilograms of cocaine in the period leading up to the present prosecution and that those distributions were part of the same course of conduct as the attempted sale to Gibson. At a *Fatico* hearing, the government called as a witness one Ellis Williams, who testified that he had regularly bought cocaine from Giraldo between 1985 and 1991 and that he had introduced Gibson to Giraldo. At trial, Gibson similarly had testified that when

Williams, who had been his supplier, moved his base of operations to Alabama, Williams introduced Gibson to Giraldo so that Gibson could do business with Giraldo. Gibson then began using Giraldo as his exclusive supplier in 1988 or 1989, and he made purchases at intervals of two weeks to two months. His purchases had been interrupted by his arrest and detention in late 1993 and, so far as Giraldo knew, were to resume in March 1994. The quantity to be sold on March 3, 1994, was similar to the quantities Giraldo had sold Gibson in 1991–1993. The planned March 3 sale was to take place in the same parking lot in which Giraldo had made 80–90% of his deliveries to Gibson in the past; and Giraldo communicated the precise timing of his anticipated arrival in the parking lot by the same method he had used in their past dealings. This evidence was sufficient to permit the court to find that the March 3 aborted sale to Gibson was part of the same course of conduct as Giraldo's earlier sales to Gibson and Williams.

■ As to quantity, Williams testified that during the 1985–1991 period, he purchased 50 kilograms of cocaine from Giraldo. In addition, Agent McArthur described Gibson's account of his narcotics dealings with Giraldo, to wit, that initially Gibson bought small quantities from Giraldo, and that from 1991 to 1993 he purchased 1–2 kilograms from Giraldo every month or so; there was occasionally a gap of two months between purchases, but not longer. The sentencing judge, who also had presided over the trial, stated that he found the testimony of Williams and McArthur at the *Fatico* hearing, and of Gibson at trial, to be credible. Although the court stated that it had no doubt that Giraldo was responsible for approximately 50 kilograms of cocaine, it stated that it could not make a precise finding as to the quantity and elected to "resolve that lack of specificity in favor of the defendant." (Giraldo Sentencing Transcript at 22.) The court noted that the amount attributable to Giraldo was more than 15 kilograms even if only the testimony of Williams were considered and concluded, "I cannot say what the precise amount [attributable to Giraldo] is,

but I can say without any hesitation it far exceeded 15 kilograms." (*Id.* at 23.)

We can see no basis in the record for overturning the district court's credibility assessments, its findings of fact, or its conclusion that Giraldo's base offense level was that assigned for 15–50 kilograms of cocaine.

### 2. The Obstruction–of–Justice Enhancement for Fermin's Perjury

In calculating Fermin's offense level, the district court made a two-level upward adjustment for obstruction of justice pursuant to Guidelines § 3C1.1, on the ground that Fermin perjured himself at a pretrial hearing to determine whether he had standing to move to suppress the gun found in the Pontiac. Fermin contends that the adjustment was improper on the grounds that the court failed to make sufficient findings, that he did not commit perjury, and that the adjustment was unfair because the court had forced him to testify at the hearing. We disagree.

■■■ The Guidelines provide for a two-level adjustment for obstruction of justice. *See* Guidelines § 3C1.1. The conduct warranting such an adjustment includes "committing ... perjury," and "providing materially false information to a judge." Guidelines § 3C1.1 Application Note 3(b) and (f). In order to impose an obstruction-of-justice adjustment, the court must make a finding of specific intent. *See United States v. Thomas–Hamilton,* 907 F.2d 282, 285 (2d Cir. 1990).

In the present case, there is no dispute as to what Fermin testified at the hearing. He testified that he had borrowed the Pontiac from an individual named Carlos; that he did not know Carlos's last name; and that he had only met Carlos a couple of times on the street. Fermin said he had never seen Carlos drive the Pontiac before the day Fermin borrowed it. Fermin did not have Carlos's phone number; he had once had it on a piece of paper, but his wife threw it away. Subsequent to the arrests, Fermin had not received any inquiry from Carlos as to what happened to the car.

■■■ In opposing the obstruction-of-justice adjustment, Fermin's counsel did not contend that this testimony was true. Rather, he argued that Fermin could not have had the requisite intent to obstruct justice because he lacked the necessary intelligence.

In determining that the adjustment was applicable to Fermin, the court found that "the information that he furnished was material" (*id.* at 5), and that "it was clearly false. So it was false testimony on a material issue" (*id.*).

> Then the question is whether he intentionally provided that information with intent to obstruct justice.
>
> It may be that Mr. Fermin may not be as smart as some other individuals, but ... I think he had sufficient intellectual and emotional wherewithal to understand what he was trying to do. What he was trying to do was extricate himself from the situation by intentionally providing false information to the Court on a material issue and that scenario brings his conduct within the purview of an obstruction of justice.

(*Id.* at 5–6.) Describing Fermin's testimony as "basically ludicrous" (*id.* at 6), the court stated

> I observed his demeanor and his demeanor indicated to me, at least, he understood what he was doing. What he was doing was trying to mislead this Court.

(*Id.*)

These findings were sufficient and were supported by the record. Fermin's contention that the enhancement should not have been applied to him because the district court directed him to testify at the pretrial hearing without warning him that materially false testimony under oath or affirmation could result in a higher sentence is meritless.

### CONCLUSION

We have considered all of defendants' contentions on these appeals and, except to the extent specified above, have found them to be without merit. The judgment of conviction of Fermin is in all respects affirmed. The convictions of Giraldo and Tellez on the narcotics counts are affirmed; their convictions under § 924(c) are reversed. The judgments against Giraldo and Tellez are vacated, and

the matter is remanded for dismissal of the § 924(c) count against them and for resentencing on the narcotics counts consistent with the foregoing.